UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**GANESA ROSALES**

v.                                                                                    Case No. 16-cv-3208

**HCA HEALTH SERVICES OF TEXAS, INC., and
PASADENA BAYSHORE HOSPITAL, INC.**

_____/

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW GANESA ROSALES (hereinafter "Plaintiff") filing this *Original Complaint*, complaining of HCA HEALTH SERVICES OF TEXAS, INC. ("HCA") and PASADENA BAYSHORE HOSPITAL, INC. ("Bayshore"), or collectively referred to as "Defendants," and for her cause of action would respectfully show the Court as follows:

### I.   INTRODUCTION

1. This is an employment action alleging retaliation under TEXAS HEALTH & SAFETY CODE § 161.135, *et seq*. Plaintiff also alleges Defendants tortuously interfered with her existing contract with her placement agency. Plaintiff seeks to recover actual damages, mental anguish, exemplary damages, attorney's fees, compensation for lost wages, reinstatement of lost fringe benefits or seniority rights, taxable costs of court, and prejudgment and post-judgment interest from Defendant.

### II.   PARTIES

2. Plaintiff GANESA ROSALES is an individual and Registered Nurse residing in Los Angeles, Los Angeles County, California.

3. Defendant HCA HEALTH SERVICES OF TEXAS, INC. is a for-profit foreign corporation. Defendant maintains its principal office in Nashville, Tennessee, and can be served with process by serving its Registered Agent, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201. At all times relevant to this lawsuit, HCA owned and/or managed Bayshore hospital facility and employed nurses, physicians, and administrative staff for the purposes of providing for-profit health care to the area in and around Pasadena, Texas.

4. Defendant PASADENA BAYSHORE HOSPITAL, INC. is a corporation licensed to conduct business in the State of Texas. Defendant maintains its principal office in Nashville, Tennessee, and can be served with process by serving its Registered Agent, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201. At all times relevant to this lawsuit, Bayshore operated a hospital facility in Pasadena, Texas.

### III. JURISDICTION AND VENUE

5. The Court has personal jurisdiction over Defendants because Defendants have employees located in the State of Texas, maintain offices in the State of Texas, and regularly conduct business in the State of Texas, thus satisfying the required minimum contacts with the forum. The Court has subject matter jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states.

6. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Venue is also proper under 28 U.S.C. § 1391(c) because Defendants have sufficient contacts with the Southern District of Texas, such that Defendants are residents of the Southern District of Texas for the purposes of venue.

## IV. ALLEGATION OF JOINT & SEVERAL LIABILITY

7. All of the Defendants conspired, jointly caused, knowingly participated and/or aided and abetted each other in the wrongful conduct described hereinafter, so as to be jointly and severally liable to Plaintiff.

## V. FACTUAL BACKGROUND

8. Plaintiff brings this lawsuit seeking equitable relief, actual damages, lost income, mental anguish damages, exemplary damages, attorney's fees, taxable costs of court, pre-judgment and post-judgment interest relating to Defendant's retaliation against Plaintiff for reporting violations of law, including patient safety violations. Furthermore, as part of its retaliatory efforts, Defendant tortuously interfered with Plaintiff's contract with her placement agency.

**(a)** *Plaintiff's Experience*

9. Plaintiff is a Registered Nurse who currently holds a Compact License, which allows her to practice in 25 states, including Texas.

10. During or around June of 2016, Plaintiff relocated to Los Angeles, California because her husband, a physician, accepted a position with a new health care facility. Soon after relocating, Plaintiff signed a 13 week contract with American Mobile Network ("AMN") to work as a travel nurse. AMN is an agency that contracts with health care facilities around the nation to fill their temporary or long-term nursing and staffing needs.

**(b)** *Plaintiff's Experience at Bayshore*

11. On or around August 23, 2016, AMS deployed Plaintiff to Bayshore in Pasadena, Texas to fill a nursing need at its geriatric psych unit. Plaintiff's assignment at Bayshore was for a 13-week contractual period. In September, AMS contacted Plaintiff and informed her that Defendants were impressed with her work and wanted to extend her contract if she would agree to

stay on. At that time, Plaintiff had not had any negative evaluations, discipline issues, or complaints about her work.

12.     Later in September of 2016, Plaintiff was assigned to care for a male patient in his mid-fifties suffering from a traumatic brain injury ("TBI"). Defendants reported that the TBI patient was "combative," "incoherent," and would spit at the staff. Defendants warned Plaintiff to "not go near him." Plaintiff observed Defendants' staff moving him very forcefully when he had to be moved, and she never saw anyone try to speak to or comfort him in any way. Plaintiff felt Defendants largely ignored the TBI patient until it was absolutely necessary to tend to him. It was also apparent to Plaintiff that he had no family, as he never had any visitors or calls.

13.     When Plaintiff tended to the TBI patient, during mid-September 2016, Plaintiff reported that he communicated well and was receptive to treatment. Plaintiff would often hold the TBI patient's hand to comfort him, which appeared to make him happy. Plaintiff never experienced any of the combative behavior Defendants' staff had complained about.

14.     When Plaintiff was working a night shift during September of 2016, she arrived at the TBI patient's room to check on him and observed him lying on a mattress one of the staff had placed on the floor. The mattress did not have a sheet, and no lights were on in the room. Plaintiff immediately went to the to the nurses' aide and charge nurse to report the TBI's condition. Plaintiff was told the TBI patient was a fall risk, so they put him on the floor. Plaintiff explained that fall risk patients like him should have one-on-one care to ensure the patient would not try to get out of bed. Defendants ignored this request, even though it was warranted in the acute unit where the TBI patient was admitted.

15.     Plaintiff observed the TBI patient laying on the floor multiple nights. On several occasions his bed and person were soiled with feces because the staff had neglected to change him.

Plaintiff changed the TBI patient herself and ensured that his bed was cleaned and remade. Plaintiff understood that it is common for brain injury patients to be incontinent, but that it was never acceptable to neglect to change a patient's clothes or bedsheets when he or she had an accident. Plaintiff believed someone should have been assigned to the TBI patient's bedside, especially since Defendants had the resources to do so. Plaintiff was concerned for the TBI patient's wellbeing and safety and believed Defendants and their staff violated the TEXAS ADMINISTRATIVE CODE and Standards of Nursing Practice. Plaintiff reported the violations to her superiors on multiple occasions, as detailed further below.

16. During or around early October of 2016, Plaintiff was assigned to a female patient in her 80's who was incoherent, and suffering from both dementia and a cardiac issue. Plaintiff reported to Defendants that she believed this patient definitely needed one-on-one care because she was so confused and often in a catatonic state. All of these conditions indicated the female patient was a serious fall risk. When Plaintiff made this request to the charge nurse, she was told she should simply keep the female patient medicated so she would not wake up. Plaintiff thought it was appropriate to give the patient some medication but dangerous to keep her continuously sedated because she was a cardiac patient. Plaintiff asked the techs to assist, but they told her they "didn't want to deal with it." When Plaintiff complained again to the charge nurse about the lack of one-on-one care for the female patient, the charge nurse told Plaintiff to "put her on the floor."

17. Defendants' staff indeed placed the female patient on the floor, and like the TBI patient, she too soiled herself and was left to lay in it. Furthermore, despite the fact Defendants' staff had placed her on the floor, the female patient stood up at some point and suffered a bad fall in the middle of the night. Plaintiff was working in another area but could hear a loud crash come from the vicinity of the female patient's room. Plaintiff responded immediately to find the patient

Case 4:16-cv-03208   Document 1   Filed in TXSD on 10/31/16   Page 6 of 14

had hit her head and was in a catatonic state. Her blood pressure was also over 200. Plaintiff directed Defendants' staff to get a "crash cart," which contains emergency equipment used when a patient is coding. To Plaintiff's astonishment, the crash cart was not packed with the proper necessities, including simple items like oxygen tubing. Plaintiff therefore staying with the patient while the staff called a rapid response team.

18.    After the rapid response team took the female patient away, Plaintiff told all present, including the charge nurse, that the female patient should have had one-on-one care, as should anyone in an acute unit who is a fall risk. Plaintiff made it clear to everyone present that all omissions leading up to the female patient's removal via rapid response was substandard. The charge nurse told Plaintiff privately that he understood her frustration and that was the reason "people walk out sometimes in the middle of shifts."

19.    Following the incident with the female patient, Plaintiff returned home to attend a funeral. Soon after reporting back to Bayshore, she felt the staff members were keeping their distance from her, but the care and attitude toward the patients had not changed. Indeed, on one occasion, and 85 year-old blind woman with cancer was crying out for help from her room, and none of the staff members would go check on her. Plaintiff watched the staff members play on their cell phones while the woman pleaded for help. When it was clear her supervisors were not going to dress the substandard care and ongoing nursing code violations, Plaintiff stayed late after a shift to speak with the head nursing coordinator in his office. Plaintiff explained all of her concerns about what she had witnessed, as well as the numerous violations of nursing code and standards of practice. The nursing coordinator thanked her for her report but did not discuss taking any corrective action.

**(c)**     ***Defendants Retaliated Against Plaintiff for Reporting Violations of Law***

20.     During September and October of 2016, Plaintiff made no less than ten reports of violations of law to her supervisors, including one in-person report to the head nursing coordinator. In mid-October 2016, Plaintiff returned home to Los Angeles for the weekend to visit her husband. When Plaintiff was at the airport, she received a call from a nurse supervisor who claimed someone at the Bayshore acute unit discovered a .5 milligram Lorazepam was missing from the medication closet. The nurse supervisor told Plaintiff she needed to come in for a drug test when she returned. This initially did not concern Plaintiff because administration of drug tests is a standard procedure when medication is missing from the dispending/storage system. Furthermore, Plaintiff never took anything from the hospital and had not ingested any drugs.

21.     When Plaintiff returned to Bayshore, she reported for the drug test. To her surprise, the phlebotomist administering the test had been instructed to draw Plaintiff's blood to test for alcohol. This was bewildering to Plaintiff because blood alcohol tests are only necessary when there is probable cause to believe someone is under the influence of alcohol. Indeed, Plaintiff looked at her form and confirmed it indicated there was probable cause for alcohol, which was impossible because the test had been ordered days prior when she was not even in Houston. Therefore, assuming *arguendo* Plaintiff had ingested alcohol at some point before she left town, the test would not have shown any in her blood. Plaintiff feared that Defendants were attempting to build a false case against for discharge her. On information and belief, Defendants never made the charge nurse who had accompanied Plaintiff into the med closet to retrieve medication sit for a drug screening.

22.     After Plaintiff submitted for the drug and alcohol test, Defendants told Plaintiff she was suspended pending the results of the screening. Plaintiff remained out of work and at her hotel

for almost one week without hearing any news from Defendants. Plaintiff knew the lab results should have come back after one day at the latest. Plaintiff periodically called Defendants to check the status of her suspension, and also called AMN to see if Defendants had communicated with anyone at the agency. Plaintiff was never provided any updates on her job status until Defendants called to inform her that she was officially discharged from her position. At the same time, Defendants told Plaintiff the results of her drug test were negative, but she was fired nonetheless. Soon thereafter, AMN contacted Plaintiff and told her AMN was removing her from their roster and cancelling their contract with Plaintiff. AMN's representative indicated Defendants told her that Plaintiff had been "unprofessional" in a communicating with Defendants' staff after they suspended her.

23. All actions heretofore described constituted retaliation by Defendants against Plaintiff for reporting violations of law.

### VI.  FIRST CAUSE OF ACTION – RETALIATION AGAINST NON-EMPLOYEES UNDER TEXAS HEALTH AND SAFETY CODE SECTION 161.135

24. Plaintiff hereby adopts by reference each and every paragraph of the Facts and allegations stated in this Complaint as if fully and completely set forth herein.

25. Defendants violated § 161.135(a) by retaliating against a person who is not an employee for reporting a violation of law.

26. Plaintiff reported violations of law to her supervisors and others at Bayshore. After Plaintiff reported the legal violations, including patient safety violations noted above, Defendants retaliated against Plaintiff by, including but not limiting to, forcing her to submit to drug and alcohol screening, suspending Plaintiff from work, making negative reports to AMN, discharging Plaintiff from her duties at Bayshore, and causing AMN to terminate Plaintiff's employment.

27. Defendants' retaliation against Plaintiff violated § 161.135 of the TEXAS HEALTH AND SAFETY CODE.

28. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered actual damages, mental anguish, loss of income, lost benefits, inconvenience, loss of enjoyment of life in the past and in all probability will continue to suffer in the future, attorney's fees, taxable costs of court, pre-judgment and post-judgment interest.

29. Furthermore, Plaintiff is entitled to recover exemplary damages and reasonable attorney's fees pursuant to TEXAS HEALTH AND SAFETY CODE § 161.135(e).

## VII.   SECOND CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

30. Plaintiff hereby adopts by reference each and every paragraph of the Facts and allegations stated in this Complaint as if fully and completely set forth herein.

31. To recover on a claim for tortious interference with an existing business relationship, a plaintiff is not required to show the defendant's conduct was either independently tortious or unlawful. *See Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (identifying the elements of tortious interference with an existing contract). Rather, a plaintiff must show: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *El Paso Healthcare Sys., Ltd. v. Murphy*, No. 08-13-00285-CV, 2015 WL 4082857, at *5 (Tex. App. June 27, 2015), review granted (Sept. 23, 2016).

32. Plaintiff had a valid contract with AMN at the time she was working for Defendants.

33. Defendants willfully and intentionally interfered with Plaintiff's contract with AMN by, *inter alia*, misrepresenting facts surrounding Plaintiff's performance at work and the

substance of her communications with Defendants' staff, forcing Plaintiff to submit for a bogus blood alcohol test and disclosing such facts to AMN, suspending Plaintiff from her position, discharging Plaintiff from her position, and causing AMN to terminate Plaintiff's employment.

34.     As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered actual damages, mental anguish, loss of income, lost benefits, inconvenience, loss of enjoyment of life in the past and in all probability will continue to suffer in the future, injury to her reputation, taxable costs of court, pre-judgment and post-judgment interest.

35.     Furthermore, Plaintiff is entitled to recover exemplary damages.

### VIII.  DAMAGES

36.     Plaintiff hereby adopts by reference each and every paragraph of the Facts and allegations stated in this Complaint as if fully and completely set forth herein.

37.     Defendant's conduct and actions discussed above proximately caused injury to Plaintiff, which resulted in the following damages:

   a. Actual damages;
   b. Mental anguish in the past;
   c. Mental anguish in the future;
   d. Loss of income and benefits in the past;
   e. Loss of income and benefits in the future;
   f. Injury to professional reputation;
   g. Prejudgment interest;
   h. Costs of court;
   i. Attorney's fees; and

    j. Equitable relief, including a prohibition of the hospital from destroying records and engaging in the other acts complained of herein, *e.g.* denying Plaintiff's access to email and remote records.

38. Additionally, Plaintiff demands recovery of reasonable attorney's fees, pre-judgment and post-judgment interest, costs of court, and any other damages allowed under the TEXAS HEALTH AND SAFETY CODE and the laws of the state of Texas.

## IX. EXEMPLARY DAMAGES

39. Plaintiff hereby adopts by reference each and every paragraph of the Facts and allegations stated in this Complaint as if fully and completely set forth herein.

40. Plaintiff also seeks exemplary damages caused by, *inter alia*, the degree of culpability on the part of Defendants, *i.e.* gross negligence, fraud and/or malice of Defendants, for damages and losses relating to its actions listed above.

41. Plaintiff's injuries resulted from Defendants' gross negligence, malice, or actual fraud, which entitles Plaintiff to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.003(a), and TEXAS HEALTH AND SAFETY CODE § 161.135(e), and under Texas common law of tortious interference.

42. The conduct of Defendants' actions or omissions described above, when viewed from the standpoint of Defendants at the time of the act or omission, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff, patients at Bayshore, and others. Defendants had actual, subjective awareness of the risk involved in the above described acts or omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and patients at Bayshore.

43. Plaintiff intends to show that the factors the jury may consider in determining the amount of exemplary damages which should be awarded include:

      a. the nature of the wrong committed by Defendants;

      b. the character of Defendants' conduct;

      c. the degree of culpability of Defendants;

      d. Defendants' net worth;

      e. the situation and sensibilities of the parties concerned; and

      f. the extent to which Defendants' conduct offends a public sense of justice and propriety.

44. Based on the facts stated herein, Plaintiff requests exemplary damages be awarded to Plaintiff from Defendants.

## X.  ATTORNEY'S FEES

45. In addition, as a result of the acts and omissions of Defendants, as specifically set forth herein, it was necessary for Plaintiff to secure counsel to present and prosecute this matter on his behalf.

46. Plaintiff has retained the services of the undersigned counsel of record, and accordingly, Plaintiff sues for reasonable attorney's fees in the past, present, and future, pursuant to TEXAS HEALTH AND SAFETY CODE § 161.135(e), and other relevant statutes.

## XI.  JURY DEMAND

47. Plaintiff demands a jury trial and has tendered the appropriate fee.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff GANESA ROSALES respectfully prays that Defendants HCA HEALTH SERVICES OF TEXAS, INC. and PASADENA BAYSHORE HOSPITAL, INC. be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for (1) actual damages and injuries specifically pled herein, (2) damages in an amount within the jurisdictional limits of the Court, (3)

exemplary damages excluding interest, (4) together with pre-judgment interest (from the date of retaliation commencement through the date of judgment) at the maximum rate allowed by law, (5) post-judgment interest at the legal rate, (6) costs of court, (7) attorney's fees, (8) equitable relief, and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully Submitted,

      */s/  Jarrett L. Ellzey*
Jarrett L. Ellzey
Attorney in Charge
State Bar No. 24040864
Federal Bar No. 37369
E-Mail: jarrett@hughesellzey.com

OF COUNSEL:

W. Craft Hughes
State Bar No. 24046123
Federal Bar No. 566470
E-Mail: craft@hughesellzey.com

**HUGHES ELLZEY, LLP**
Galleria Tower I
2700 Post Oak Blvd., Ste. 1120
Houston, TX 77056
Phone (713) 554-2377
Fax (888) 995-3335

*Counsel for Plaintiff*